Good morning, Your Honors. My name is Lisa Cantor, and I'm honored to be here this morning representing the appellant Sandra Frost. I understand I have 15 minutes for argument. I'd like to reserve 5 minutes for rebuttal. This case involves the new Abate-Glenn analysis, which applies in a risk of cases where a fiduciary is conflicted. That is, it is both deciding whether to pay claims and funding that payment. And this Court has described that analysis as complex. Clearly, a district court is required to consider a variety of factors in deciding whether to reverse the decision of a conflicted fiduciary. And whether you decide to throw everything in the kitchen sink, as Justice Roberts suggests, or chuck it in a paper bag and shake it up, as Justices Scalia and Thomas suggest, the requirement is that district court judges consider all of the facts and circumstances, without a precise formula, without a detailed set of instructions, for such things the Supreme Court found falsify the actual process of judging. Now, here the district court did not have the benefit of the Glenn decision and expressed to trial its frustration and confusion with the lack of detailed instructions it found in Abate-Glenn. And so the Court purported to give a narrative description of its decision to aid in appellate review. And so here we are. The district court decision must be reversed for at least three different reasons. First, it failed to consider at least two critical pieces of evidence. Second, it followed MetLife's error in relying on clearly erroneous facts. And three, it failed to properly analyze and apply the conflict of interest under which MetLife operates. Before you start on that, could I just ask a preliminary question? Of course. In looking at the plan, there seemed like there were two different periods. There was the first period where the own occupation standard applied, and then after two years the any occupation standard. Those are quite different. And so are you saying that the plan erred in both areas and applying both standards or just the any occupation standard? MetLife terminated benefits before the own occupation standard expired. And its conclusion was that she could perform her own occupation or any occupation. My position is that under the Pannebecker case, which I brought to the courts of attention under my supplemental authorities, when a fiduciary does not follow its obligations, the court should enter judgment to the date of the decision, whether it's ONOC or any occupation, because there's nothing that can correct the error that the fiduciary already did. Now, the case, of course, would then, if Ms. Frost gets judgment, then she would be under continuing disability benefits and she'd have to comply with the obligations of the plan. So if MetLife at some point decided to examine her or ask her for more evidence, of course they could do that. But so are you saying that she doesn't meet, your client doesn't meet either the own occupation or the any occupation that MetLife erred under both standards? Correct. And the first area of evidence I want to talk about goes to that issue, because what the district court failed to consider was the fact that MetLife told Ms. Frost to apply for social security disability benefits. It gave her the name of a law firm to help her obtain those benefits. It shared her medical evidence with that law firm. When she got benefits, it recovered the overpayment when the benefits were awarded. It deducted the amount from her monthly check. And then, after all this, it cut her off. And when it cut her off, it didn't explain how it could reconcile what it had done with the Social Security Administration with its own decision. This is exactly the same course of events that happened in MetLife versus Glenn with the same carrier, MetLife. And the Supreme Court specifically stated that this was not only an important factor in its own right because it suggested procedural unreasonableness, but it also would have justified the court giving more weight to the conflict because MetLife seemingly took inconsistent positions. The district court mentioned the facts that she got Social Security benefits, but never analyzed how that affected its analysis under MetLife and Glenn of what MetLife had done. Are you urging that as kind of an estoppel argument? Well, in ITTV-LAD, the court said it's sort of in the penumbra of judicial estoppel. It doesn't exactly apply because it's not the same parties. But there's something very suspicious about it. And when we're doing this kind of analysis of all different kinds of factors, you at least have to consider it. And when you have a carrier that doesn't explain how they took those inconsistent positions, the district court is obliged to at least address that issue. And that wasn't done. The Social Security Administration, they have to take the treating physician in their hierarchy and give more weight to that, whereas the Supreme Court said we don't do that in the ERISA context. Why couldn't the district court have just relied on that factor in looking at MetLife's determination? It doesn't make it inconsistent. Well, for at least one important reason, and that's that the Social Security Administration determination is the NEOC determination. So when MetLife is still determining whether she can do her own occupation, the Social Security Administration has made the greater finding that she cannot do any occupation. And whether they had to give deference to the treating physician or not, they've made that determination of the next step. Plus, they had all the same information because MetLife was the one who supplied it to them. I know, but we can't. But just because the Social Security goes one way and they go another way, that isn't the end of the inquiry, correct? Correct. And if that was all that happened here, that's one thing. But the other part of it is when they encourage her, they give her a law firm to hire, they share information, they take the overpayment, and then they don't tell you, they don't tell her ever how they reached a different conclusion. And then to add to the problem, the district court doesn't somehow try to reconcile that very severe discrepancy. Well, just because they refer you to a lawyer, while that may be encouraging, you can't come to the conclusion there that you're going to get benefits just because they say go to a lawyer, right? That's right. But they're having her hire a law firm and urging that she cannot perform any occupation. At the same time that they're concluding she can perform her own, which is a lesser standard. There was a requirement under the plan, wasn't there, if I'm remembering correctly, that she did apply for Social Security and they got the reimbursement if she got it. So I guess I don't see why that would be inconsistent. But maybe I could ask you another question and focus on why the MetLife erred in saying that she didn't meet the any own occupation standards, since I don't think the court or MetLife or anyone really focused on the any occupation. Sure. I'd be happy to address that. And, in fact, that was the second piece of evidence that our position is that district court didn't consider. Because when MetLife got reviewing doctors to review her records, they reached the general conclusion that she could perform her own occupation, but they imposed specific restrictions and limitations that were inconsistent with her own occupation. And no one ever talked about that conflict. So when you talk about Dr. Jaris, who is a neurologist, he says she retains the ability to perform her usual occupation. Then he contradicts himself and says she can only stand for two hours a day, her job requires six hours of standing a day, she can only walk for two hours a day, her job requires six hours of walking a day, she could never operate foot controls, and she should not drive, and her job requires her to drive a forklift. The same thing happened with Dr. Duval. She, again, general conclusion that she does not have an impairment that would preclude the ability to work at her usual occupation, she imposed restrictions that she can only walk or stand for four hours a day. Again, her job requires six hours a day. Dr. Duval also says she should never be around mechanical moving parts. I don't really know how you operate a forklift without being around mechanical moving parts. The own occupation definition includes this language that we don't mean the thing you're actually doing, but something that's similar. What was in the record or what sort of evidence was there that there were similar occupations at Wells Fargo that she could perform? None. The only definition that was provided was the definition provided by her supervisor. The only time we heard the argument about this language in the own occupation was in the brief on appeal.  So MetLife never said, well, wait a second, you could get another job at Wells Fargo, and here's the job you could possibly do, and that's what our definition of own occupation was. Never raised, never told to her in either her denial letter or her appeal letter. Do you want to reserve the balance for rebuttal? Of course. Thank you. Good morning, Your Honors. I represent Metropolitan Life Insurance Company in this matter. And you're right. I have seen you before on Monday, I believe. But state your name for the record. I'm Rebecca Hull. Thank you. First of all, would the Court like me to address something specifically, or would you like me to just discuss this with you? Well, I'm certainly interested in your addressing this any occupation issue, and given that your client's own doctors, I guess, Dr. Duras and Dr. Duvall, indicated restrictions that were inconsistent with the Wells Fargo job description of what she was currently doing, why was it that she didn't qualify for at least for the own occupation benefits? Well, Your Honor, you were the one who pointed out quite correctly that that is not the definition of disability in the plan. The definition of disability in the plan is not the specific job you are doing. It is that occupation for your employer or any employer in your local economy. Now, I think it's necessary to... Is that the any occupation or is that the own? That's own. Any occupation is basically anything you're suited for. And so what evidence was there in the record? The language I have here says it may be a similar activity that could be performed with your employer or any other employer. So what evidence was there that there was a similar activity that, given the restrictions that Dr. Duras and Dr. Duvall indicated, that she could perform? Well, the first point, I would think, would be any bank is going to have an operations manager. I mean, that just is kind of a given, although the function may very well differ from bank to bank in terms of what it actually involves. But really the point is, it is her burden to demonstrate at all points that she is disabled. So it is her burden, in my view, to come forward and say, I've looked at other banks in the local economy. Every one of them that has any kind of an operations manager position would require me to drive a forklift, if, in fact, you think she was required to drive a forklift, which I have a little trouble believing, but I've kind of left that go because the record has some indication that she did do that. But the point, really, is that the question is not the specific job she did at Wells Fargo. It's in the plan language. MetLife is required to apply the plan language as written, because it's a fiduciary. So, therefore, it is required to take this language and say, did you demonstrate to us, because it is your burden as the claimant to demonstrate it, that you meet this standard? In the lengthy letter they sent her explaining why they were denying her claim for benefits, I didn't see anything that was specifically relating to the similar activity language. It was saying, you're capable of performing the work that you're currently doing. So I was just wondering where MetLife had actually related to, say, to that specific language in the plan. I don't think they focused down that narrowly on that particular aspect of the definition. They simply referred her to the definition and said, own occupation, and, of course, that's what the plan says own occupation means. Is that a problem? No, I don't think so. Why not? Because they referred her to the plan language in question, which is, can you do your own occupation? And she has the summary plan description, just like all participants do. She knows what the plan says. In fact, given the letters that she wrote and the details she went into, I think it's pretty clear that she had pored over all of this at great length and probably for hours at a time. I have rarely seen such a diligent person in terms of keeping track of everything and making notes about everything. And, in fact, the letter denying benefits notes that. But I'm looking at this language that says, given your job description, the objective medical information did not support your inability to fulfill your own job duties, which appeared consistent with a sedentary to light position, which seems to be inaccurate. Her job description, as described by Wells Fargo, and given the limitations by the doctors, was there a need to go further and explain why she also wouldn't be able to function on a similar activity? Is that a problem? No, I don't think so. Because, again, it's her burden to demonstrate that she couldn't. Could they have gone further? Absolutely. I mean, you could always write a 15-page letter instead of a three-page letter. That doesn't require much of an addition, does it? No. It's not like a 15-page letter. Isn't, you know, just as litigants are entitled to have courts explain what they're doing and why, isn't it a men's life responsibility as fiduciary to do the same? I agree, except that I suppose on some level you have to take us, maybe not a 10,000-foot view, but at least a, you know, 200-foot view, instead of getting clear down to the minutia of everything. I mean, it's, to me, it's... What are fiduciary obligations in that context? Don't they import a responsibility to the party that's making an application and say, we turn you down and here's why? Of course. And they didn't do that, did they? Well, I feel that they did, Your Honor, and maybe we simply... Only in terms of own occupation, right? Right. Well, they had never reached the any occupation point, although they were only maybe six weeks from that point when this denial came out. Because that was how, in fact, they ended up reexamining the whole question, was that they were getting ready for a transition, and that's why they referred the record shows. That's why they referred the file originally to someone to take a look at the records that had been generated to date. And they got back the first analysis that said, well, okay, we see lots of test results here, but we don't see anything tying those test results to the symptoms that have been described or explaining how those result in a limitation. Well, if they did not reach the any occupation, then does it have to be remanded to deal with that? If the court believes that there is an issue about that tail end of the own occupation period and sends it back on that basis, then, yes, they would have to look at the any occupation when she reached that point. That's not a determination they made because they made the determination, as I said, about, I think, about six weeks shy of the end of that. Isn't that essentially what Ms. Kander had said? That is, in challenging the current determination as being inconsistent, I think she's acknowledged that if it were to get sent back, that life would be free to inquire into the other aspect that was not before them at that point, according to your presentation. Well, yes, of course it would be free to do that. I don't agree that that means she necessarily gets benefits all the way through to today, but that's a separate issue, really, because in order to do that, she would have to be found to have been entitled to any occupation benefits all through that period, and that's a separate inquiry that, in fact, was not addressed specifically at any point. I think that some of the doctors were anticipating that when they reviewed her records, but that wasn't a determination that MetLife specifically addressed. May I get back? You mentioned that the petitioner, that the claimant, has the burden to prove that they meet the definition, and I just was wondering where statutorily or in the plan, because normally the claimant comes forward with the proof of their disability and their medical reports, and then it's the plan that would determine whether the person is qualified to get the benefits. Certainly. The summary plan description itself talks about the fact that the claimant must, at various specific points, provide proof that he or she meets the standards, and let me see if I can just find that quickly for you. But it is specifically, let me see, that would be at excerpts of record 70, which is section 15, excuse me, page 15-13 of the summary plan description, which is page 45 of the administrative record, where it says, once you receive the necessary forms for filing a claim, complete and return them, you must provide MetLife all of the following documents, proof of disability, evidence of continuing disability, which is what we're talking about now, proof that you're under appropriate care and treatment of a doctor, et cetera, et cetera, including any other material information related to your disability, which MetLife requests. That's an obligation to present evidence that then the fiduciary makes a judgment on. Correct. But I think my focus here is on the second item here, evidence of continuing disability. Oh, I understand. But that's presenting evidence. That doesn't talk about the question of whether it's persuasive or not is ultimately the decision by the fiduciary, isn't it? Well, yes, of course. But it's her job to come forward with something to show at each point when she's asked to do that, which happens several times in this process. It's her job to come forward with the documents per the summary plan description that show in fact that she can That's the burden of production, but is that the same as the burden of persuasion? I guess that's what, because you said it was her burden of proof to establish that she was disabled. Well, and that's what the Jordan case says from this circuit, as it particularly is amplified by the, I believe it was the central district that got into the, you know, sort of nitty-gritty level of that. And we've cited it in our brief. But it's always the claimant's burden to show that they are in fact entitled to benefits. But is there anything suggesting, because you're suggesting that she would have to come forward with evidence that there are not other employers out there who might have jobs, so she would have to disprove this job issue. And that seems to be a little bit beyond what's listed here at ER 70. Well, I think it's implicit in that, because if she's coming in and saying, I'm making a claim for benefits, and I say I meet this standard, and the standard says what it says, then I think it's up to her to show that she meets that standard. It's not up to the fiduciary to disprove her claim. It's up to her to prove her claim, I think, because I don't see any other way that it can work. Otherwise, you have almost an impossible situation. She has the evidence. And she produces some evidence, and then the fiduciary makes a judgment, and we are supposed to evaluate the fiduciary's judgment. Correct. But again, that's production, not persuasion, isn't it? I think that's true, but I think that in such an informal setting, it becomes conflated substantially. And I think that there's a lot of back and forth. It's like the livery of season. It's got to be someplace. I'm sorry? Well, no, I do think that these things become quite mixed ultimately, but I think that it's up to her to come forward at least and say, look, I say I can't do the job I used to do, and by the way. Well, arguably, she puts in, I mean, the problem. I mean, she says there's just tons of things wrong with her, you know, and that, I mean, essentially that she can't get out of bed. Well, yes, she does appear to have, I guess. When I read this file again over the last couple of days, I had a mental image of a magnet attracting filings because it really, without sounding flippant, I mean, it really sounds like someone who anything they've ever heard about a possible condition that they could possibly have, suddenly they think they have it. I mean, by the end of this process, she's got a laundry list of 25 or 30 things that she says she has, even though her doctors haven't confirmed any of them other than fibromyalgia, I think, was one that they said, well, we think she has it, but they didn't comment on whether it was disabling. But I agree that she certainly came up with a big, long list of things that she said she had. One thing I would like to point out as part of this discussion before my time runs out, which is in about two minutes, is that what we have here is a whole lot of tests being performed, a whole lot of possible explanations being considered by her doctors, but no one ever tying these specifically to what she says are her inabilities to work. That was the point of most of the IPC discussions, which is, yeah, she had lots of test results, but most of them were within normal limits or only very slightly outside normal limits, and there was nothing tying them to what she said were her limitations. That was the disconnect here always. No one could ever explain this. And if I can give a hypothetical, suppose I said to my firm's LTD carrier, which I can't remember who it is, actually, I have excruciating pain in my side and I cannot work. And I start going to doctors, and the doctors all dutifully report that I say I have excruciating pain in my side and I walk like I have pain in my side, but they can find no explanation for this. Should the carrier be obliged to pay benefits because I said that to my doctor and my doctor said, she's not crazy, I believe her? I don't think that that is appropriate for a fiduciary to take that kind of statement and say, okay, fine, we'll pay benefits, without anything demonstrating that there is some basis for tying that to something in the real world that would explain it. Sometimes people could have a disease, arguably. I know a situation where someone that I've known for many years that their daughter was normal and then when she was a teenager she just started going downhill. Now she's like in her early 30s, and she is a scooter, a wheelchair, all of those things. And everyone agrees she has some debilitating disease, but they've never been, she doesn't have MS, she's been to all the doctors, they don't know. I mean, so there could arguably be, I mean, her doctors agree that she's not faking, that there's something that's causing her not to be able to do it, but they don't know what it is. But I imagine they have a little bit more to say than what was said here, which is basically two ships that are parallel but never meet. One, here's what she says. Two, here are all the tests we've run, and we've run a million of them, and we can't find where these lines intersect. And it seems to me that the problem here is that if you say to a fiduciary, basically, you cannot refuse to pay benefits to someone who cannot demonstrate to you that there's any rational basis for what they report to be their symptoms, then what you've got is a situation where no claim can ever be denied as long as the person makes a convincing argument to their doctor and the doctor is willing to support it. You found, even your own people found limitations that were out of sync with what her job required her to do, as Ms. Cantor has pointed out. So it's not quite the same, is it? I would say... I mean, you know, sitting, being able to sit or stand for two hours when the job requires six, that's, you know, whatever the ideology of it is, that's the conclusion that the retained people came to. My reading of those reports is that they said six hours at a time, not six hours total. And I was a little bemused listening to this, thinking, okay, we're already up to 12 hours a day, because you can't take the position that she has to stand for six hours and she has to walk for six hours and not come to that conclusion. That's typically, as you know, I'm sure, something that is always covered by sit, slant, stand. And so the idea of saying that's 12 hours is just a mischaracterization, isn't it? I don't think that it is, Your Honor, based on what I was hearing. But what I'm saying is my reading of the IPC reports is that they were talking about how many hours at a time. Could she walk around for six hours at a time? And I didn't see anything, even in her specific job description, that said that she has to walk for six hours at a time without a break, without sitting and so on. My understanding of her job is that it was the typical managerial job. You're sitting at the desk. You're walking around. You're sitting at the desk. You're walking around. Well, I wish I had a nickel for each of these cases that I've had. And I tell you that they invariably speak in terms of cumulative time, not that you have to. How many of us could stand for six hours consecutively at a time? Come on, that's really not the test, is it? It's really the aggregate of sit, stand, depending on what the job requirements are. And it's a total out of eight hours. Otherwise, you know, it would be a contradiction in terms to say out of eight hours, you have to be able to stand six hours at a time and sit six hours at a time. That is not how the clock works, is it? Well, I agree, Your Honor. That's why I was a little surprised to hear that. But I see I'm way over time. All right. Thank you for your argument. Thank you. You're not over time when we ask you a question, so you still have to answer. All right. I'd like to start with the issue of her job and point out that at page 1224 of the record, the plaintiff put in her findings of fact and described her job, including the stand, sit requirement and driving a forklift, and the defendant admitted that that was an accurate description of her job. There is nothing in any of the findings of fact presented to the trial court about a different kind of job she could have done at Wells Fargo or at any other bank. And actually in the denial letter, the appeal denial letter, they describe her job, what your job is this, and then they go on to say we think you can perform it. Can you address this burden of proof question? Wasn't it Ms. Ross' obligation to show that she met the own occupation standard? It's her burden to come forward with proof of disability, which is what she did. She came forward. She filled out her form. She said, I am disabled. I cannot work. I can't work my job. I can't work any job. The issue then becomes that the MetLife has an obligation then to take that information, and if MetLife says, well, wait a second, we think you can perform a different job at the bank, it becomes an issue of communication under SAFON. They need to communicate with her and say, you know what, we're thinking that maybe you can't perform your job the way it's described, but you could be something else in the bank or at another bank. Give us information about that. Without that communication back, what is she supposed to do? So it's sort of in the, where we talk about burden of proof and burden of persuasion, it's like an exclusion. She's coming forward with proof of disability. They want to apply an exclusion. At the very least, they have to come back and say, we think this exclusion applies. Well, but let me ask you this, too, that I think the appellee raises a point that has to be discussed, and, you know, I mean, someone could report that everything is wrong with them, and in a situation really there isn't, there were a lot of tests done, and they couldn't seem to figure out, they couldn't seem to support that. So in that situation, why would someone be required to? I mean, we see a lot of cases where people say there's things wrong with them, and there's support for it. But here, you know, everyone looks at her and says, I know she says this, but we can't find any proof of it. Well, I have two responses, Your Honor. You know, we hear from insurance companies all the time that just because you have a diagnosis doesn't mean you have a disability. Well, just because you don't have a diagnosis doesn't mean you don't have a disability. The only thing Ms. Ross was missing was a unifying diagnosis that explained her whole constellation of symptoms. Well, the one on fibromyalgia wasn't particularly persuasive in that the doctor really doesn't say much, just says it, and it seems to be based on what she tells him. I agree with that, Your Honor, but we also have to remember that she's got an MRI that's showing an 8-millimeter herniation of her cerebral tonsils into her foramen magnum, which is commonly known as an Arnold-Chiori malformation. Now, their doctors dismiss it and say it's incidental in the population. I don't know. If you research this malformation, it actually accounts for many of her symptoms. And, in fact, Dr. Jarvis says Then why doesn't she have a doctor that says that, that what you're saying is true? I wish I knew, because I think at this point I almost have my medical degree after doing all these cases, and it makes some sense to me. But there's more, because she also has an abnormal visual evoked potential to study, and that's commonly shown with patients with MS. She doesn't show the white plaque in her MRIs to give a diagnosis of MS. She also shows protein in her spinal tap, which is consistent with patients with MS. Her gait disturbance and her ataxia are confirmed by multiple examinations. Now, objective evidence can include a doctor observing something over time, and they keep saying there's something wrong with the way she walks. We believe her. We've treated her for many years. We don't think she's making this up. She cannot walk. She's using a walker or a wheelchair all the time. But she can't get one doctor to say that all of those things could be, you know. I mean, that's problematic. It's problematic for her, for sure, because it's really difficult to treat someone who's in constant pain and can't work, and nobody knows what to do with her. It's devastating. I need to wrap up your comments. Sorry. I think the point that was made, the two final points I want to make are, her reviewing doctors found limitations inconsistent with her own job. Pain cannot be determined by objective evidence. Pain is reported. Doctors observe it. They observed her credibility. They said she was credible. They rejected the possibility of her making it up or malingering, and that's the record we're left with. Thank you. Thank you for your argument. This matter will stand submitted. Thank you. Do they have another one, the two of them? Okay. Well, I need to – I'm – All right. Why don't you just call the names so we know who's here. Okay. Mr. Arts. Sarah Maloney. Jonathan David Montes. Joe Heller. Daniel Woodward. Stuart Handels. Rachel Urquhart. And Michael Leonard. Two seconds. So are we ready on – all right. The first matter on calendar is Monica Lopez-Ambrise v. Michael MacCasey, 0476-5133. And that matter is submitted on the briefs. It will stand submitted. So which one are we ready to call? We're ready. Amara Omar Mohamed. Okay. And then none of the others we have a match on yet? Is that what? The only one that we don't have is the first – Is the Diaz. Someone just walked in and it might be – call that again. Mr. Arts. Okay. And that's on which case? That's on this meeting. Okay. And we're ready on all the others? We're all ready on all the others. Okay. All right. So Amara Mohamed v. Michael MacCasey, case number 0476-700. You have ten minutes for each side. If you want to save any for rebuttal, if you tell me how long, I'll try to alert you at that point.
judges: Callahan, Ikuta, Shadur